IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

DEON BROWN,

Defendant.

CRIMINAL CASE NO.

1:09-CR-0484-TWT-JFK

## **REPORT AND RECOMMENDATION**

Pending before the court is Defendant Deon Brown's motion to suppress evidence and statements. [Doc. 28]. An evidentiary hearing was held on the motion on July 28, 2010, and concluded on September 21, 2010.[1] In his post-hearing brief in support of the motion to suppress evidence and statements, Defendant contends that the Georgia Parole Officers ("PO") who conducted the warrantless search of his residence on September 9, 2009, did not have a reasonable suspicion to support the search as required and that all of the evidence seized from the search of the residence, as well his statements, should be suppressed as fruits of the unlawful search. [Doc. 58]. Defendant does not present any other arguments supporting suppression of the

---

[1]Citations to the July hearing transcript are: (Tr. at ). And citations to the September hearing transcript are: (9/21/10 Tr. at ).

statements that he made before and after the search, including after he was arrested on the parole violation warrant and advised of his <u>Miranda</u> rights.[2]  [<u>Id.</u> at 10].  The Government opposes the motion to suppress arguing, first, that no suspicion was required for the search, pursuant to the terms of the parole certificate and the Supreme Court decision in <u>Samson v. California</u>, 547 U.S. 843, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006); second, that even if reasonable suspicion was required, the facts supported the search; and third, that Defendant waived any challenge to the search by agreeing to the terms of his parole.  [Doc. 61].  Accordingly, none of the evidence seized from the search nor statements made by Defendant should be suppressed as fruits.  [<u>Id.</u>].  The Government did not, apparently due to Defendant's silence on the matter, address any other potential basis for suppression of the statements.  [<u>Id.</u>].

Based on a review of the totality of the facts established at the evidentiary hearing and applying binding and persuasive legal authority, the court recommends that Defendant's motion to suppress be denied.

---

[2]Likewise, in his motion to suppress statements, Defendant only seeks suppression of his post-arrest statements based on those statements being fruits of the allegedly unlawful search of his apartment.  [Doc. 28 at 4].

2

## I.     Facts

On or about January 7, 2009, Defendant Deon Brown, who had been convicted of various State of Georgia felony drug offenses and a theft by receiving stolen property (an automobile), received a reprieve allowing his release on parole for the remainder of his custodial sentence.[3]  (Tr. at 5-7, 16; Gov't Exs. 1 and 2).  Upon release, Defendant Brown had twenty-four hours to report to a PO in order to review and receive a copy of the certificate of release and the standard release conditions.  (Tr. at 8).  Defendant met with PO Daryl Boatwright on January 8, 2009, and signed the acknowledgment of conditions of release which was witnessed by the PO.[4]  (Tr. at 8-

---

[3]Denise Brown, a Senior PO with the State Board of Pardons and Parole, testified that excepting some technical procedures having to do with the manner of release, a reprieve and a release on parole are the same in Georgia.  (Tr. at 5-7).  For example, prior to being released on parole, the potential parolee must provide an address at which he or she will reside in order for the address to be investigated and determined to be suitable.  However, an individual released on a reprieve is not required to provide the residency address prior to release but does so at the first meeting with a PO.  (Tr. at 6-8).  Thereafter the conditions and terms of release - or parole - are the same.  (Tr. at 7).

[4]Defendant did not meet initially with PO Brown, who supervised him during his parole period.  However, she identified the certificate and conditions of release taken from Defendant's parole file, the signature of PO Boatwright on the forms, and testified as to the standard procedures followed at the initial meeting - including the fact that had Defendant refused to sign and agree to abide by the conditions of release, he would have been returned to custody.  (Tr. at 8-11, 13, 53).  She also testified that during her supervision of Defendant, she has discussed many of the conditions of

3

11).  If a parolee refuses to agree to and execute the certificate and conditions of release, he or she is returned to custody.  (Tr. at 13).

Among the standard conditions of release on parole, Defendant Brown agreed to "truthfully answer all questions and follow all written and verbal instructions from my Parole Officer[;]" agreed that "[m]y Parole Officer or any Parole Officer may, at any time, conduct a warrantless search of my person, papers, and place of residence, automobile, or any other property under my control[;]" agreed not to possess any controlled substance and be subject to drug testing; agreed that he would not change his residence without permission of his PO; agreed not to possess any type of firearm, ammunition or deadly weapons; and agreed to obtain a high school diploma ("GED").[5] (Tr. at 11-15; Gov't Ex. 2).  At the initial meeting, Defendant provided the residence of his sister, Chalethia Brown, 177 Moury Avenue, Apartment 2402, Atlanta, as his

_____

parole with him.  (Tr. at 11).

[5]The "Special Instructions" that Defendant further acknowledged and agreed to included reporting as required to his PO, "only resid[ing] at the address to which I am Paroled[, and] not chang[ing the] residence without first getting permission from my Parole Officer[,]" understanding that it is not "acceptable that I am living at one residence but actually staying at another[,]" and obtaining "legitimate, full-time employment" and "bring[ing] in pay-stubs *every* month on report day as proof of my employment."  (Tr. at 14-15; Gov't Ex. 2).

4

parole residence.  (Tr. at 16, 53-54).  He was instructed to enroll in classes to obtain his GED and to look for employment.  (Tr. at 16-17).

Due to Defendant's failure to comply with the instruction to enroll in GED classes, he received verbal reprimands on February 5, 9, and 18, 2009.  (Tr. at 17-18, 90, 93-94).  PO Brown also discussed with Defendant in February 2009 the fact he was still unemployed; however, on February 18, 2009, Defendant reported finding employment at Baby's First as a stocker.  (Tr. at 18, 55-56).  PO Brown attempted several field visits to confirm Defendant's employment but had difficulty locating him on the business premises on more than one occasion.  She acknowledged that both Defendant and individuals at the business advised her that when Defendant was not present, he was making deliveries and that Defendant routinely, as required, provided pay stubs indicating he was working on average thirty to forty hours a week.[6]  (Tr. at 19, 55-59; 9/21/10 Tr. at 5-11, 16).  The PO also visited the parole residence to verify Defendant's residency.  (Tr. at 54, 60; 9/21/10 Tr. at 13-14).

---

[6]PO Brown testified that, although she was advised that Defendant was out on deliveries, she did not necessarily believe that he was working.  "[B]ecause we had had prior experiences with those kind of stores and parolees using them as a front for employment, I didn't take it to, you know, to be something that I believed off of that."  (Tr. at 56).  She stated that it was possible that the employer lied to her and that she "noticed that they had time cards on the wall of all the employees and I didn't see one for Mr. Brown."  (Id.).

5

On July 9, 2009, Defendant failed to report for a required meeting with PO Brown, and she issued a violation letter to him directing him to report on July 14, 2009. Defendant reported on July 14, and PO Brown issued a verbal reprimand. (Tr. at 19-20, 60-61, 91, 94). At that meeting, Defendant asked for permission to change his address, providing only a general area to which he wanted to relocate, and PO Brown, who did not authorize the move, directed Defendant to provide the address of the new residence in order for her to determine if it was suitable. (Tr. at 21, 62-63). On August 25, 2009, PO Brown visited Defendant's parole address, 177 Moury Avenue. She spoke with a female, who claimed to be Defendant's sister. That female advised that Defendant did not live there and that he had moved out three weeks earlier. (Tr. at 21-22, 63-64). The PO directed the female to have Defendant contact her. (Tr. at 22).

On August 27, 2009, PO Brown also attempted a visit at Defendant's place of employment. He was not present. She was advised that he was making a delivery. (Tr. at 22-23, 63-64). The PO called Defendant on his cellular telephone, and he advised her that he was making a delivery. She asked for his location and advised him not to move and that she was coming to meet him. (Tr. at 23, 64). In a few minutes, Defendant called the PO to advise that he was changing his location. PO Brown told

him to remain where he was and that she was coming to meet him; however, Defendant called again to advise that he was moving. The PO repeated her instructions and gave Defendant a verbal reprimand. She believed that he was trying to elude her. (Tr. at 23). Defendant finally provided an address of an apartment complex in the area of MLK and Northside Drive and waited to meet her there. (Tr. at 23-24, 64-65).

When he met with PO Brown, Defendant was driving a late model blue Audi, which he claimed belonged to his cousin. (Tr. at 24, 65). PO Brown asked Defendant where he was living, and he stated that he was still residing with his sister. (Tr. at 24-25, 66). When the PO advised Defendant about her conversation with his sister, Defendant responded that the PO spoke with his little sister and that she may have thought that he moved because she was using his bedroom. However, Defendant did state that he "sometimes stayed with his girlfriend," Michelle Simmons at 396 17th Street, Apartment 3050, in Atlanta. (Tr. at 24-25, 66). Being aware that the location was an expensive residential area, PO Brown asked about Ms. Simmon's job, and Defendant responded that she was unemployed and that he helped with the bills. When asked how he did so on his $7.00 a hour job, Defendant did not provide a clear answer. (Tr. at 26, 86). PO Brown gave Defendant a verbal reprimand for changing his address without permission and directed him to report to her next week. (Tr. at 26, 67, 94).

7

PO Brown requested that the information provided by Defendant regarding his girlfriend's address and the Audi be investigated. (Tr. at 27, 29-30, 65, 71-73). PO Brown was advised that the Audi was registered to a person living on Altoona Place and that there was no residence for a Michelle Simmons. However, the PO was advised that Defendant had a residence located at 390 17th Street, Apartment 4050, in Atlanta. (Tr. at 30, 65-66).

On September 3, 2009, Defendant reported as instructed and was administered a drug test for which the result was positive for marijuana.[7] (Tr. at 27, 29, 67-68; Def. Ex. 1). PO Brown again asked Defendant about his residency, and he reported still residing with his sister but staying sometimes with his girlfriend, Michelle Banks (a different last name than provided previously) with a different cellular telephone number for her, in the residence located on 17th Street, Apartment 3050. (Tr. at 27-28, 73-74). The PO reprimanded Defendant for the positive drug screen and due to his lack of truthfulness. (Tr. at 28-29, 94). Defendant was directed to report on September 9, 2009, for a substance abuse assessment. (Tr. at 29, 82).

Before Defendant returned on September 9, 2009, due to all of the circumstances involving Defendant's employment, residency, lack of truthfulness, and positive drug

---

[7]Four prior drug screens had been negative. (Tr. at 78; 9/21/10 Tr. at 12-13).

8

screen, PO Brown requested permission to search Defendant's residence, and once approval was given, the search was set for September 11, 2009. PO Brown was aware that Defendant was violating his parole conditions. (Tr. at 30-31, 75-81). When Defendant arrived on September 9, 2009, he was given another drug test for which the result was again positive for marijuana. (Tr. at 31, 70, 91). PO Brown decided to ask for permission to conduct the search that day, which was granted by Parole Chief Morrow. (Tr. at 30-31, 75, 82). And the PO, who did not have authority to request an arrest warrant for parole violations, was considering seeking permission to obtain a warrant. (Tr. at 82).

Defendant was escorted from the assessment to Chief Morrow's office and patted down for weapons and contraband. (Tr. at 32-33, 97). Defendant was not handcuffed; however, Defendant was not free to leave. (Tr. at 32-33, 38, 83-84, 97, 116). On his person was a cellular telephone and $780 in currency. (Tr. at 33). Defendant was asked about his keys, and he stated that his girlfriend, who was seated in the lobby, had his keys. (Tr. at 33-34). The Chief asked Assistant Chief ("AC") Keir Chapple, who was accompanied by PO Rice, to go find the girlfriend, who was supposed to be in the lobby, and to retrieve Defendant's keys. (Tr. at 97-98). The PO's did not find her in the lobby and went outside, where she was located in a white

Infinity SUV.[8]  (Tr. at 98).  Seated in the passenger seat was Ms. Banks.  AC Chapple identified himself to Ms. Banks and asked for Defendant's keys.  (Tr. at 98, 113).  He also detected the odor of marijuana emanating from the vehicle.  (Tr. at 99).  Ms. Banks then opened the glove box, and the PO observed a large amount of currency. He instructed her to leave the glove box open and to exit the vehicle because he was going to search the vehicle.  He again asked for the keys and requested that she wait inside the office.  (Tr. at 98-100, 113-14).  Although he did not find any contraband, PO Chapple recovered the currency, some receipts, and an identification in the name Thomas.  (Tr. at 100).  When he finished the search, he went back inside, obtaining Defendant's keys from Ms. Banks.  (Tr. at 103, 119).

During this time, Chief Morrow was questioning Defendant about his residency. Defendant stated that he lived with his sister but was "sometimes staying with his girlfriend" in Apartment 3050, 17th Street.  (Tr. at 34).  At some point, Defendant admitted that he was lying about staying with his girlfriend and stated that the apartment belonged to a friend, Steven Thomas, and that the Infinity belonged to Thomas, which was loaned to him because his vehicle was in impound.  (Tr. at 34-35).

---

[8]AC Chapple said that he had been advised that Defendant indicated that he came to the parole office in that vehicle and that is how he knew to look for that type of vehicle.  (Tr. at 98, 112).

10

Defendant, however, continued to insist that the apartment number was 3050.  (Tr. at 39).  During this conversation, Defendant remained un-handcuffed, and his demeanor was calm.  He did not appear to be under the influence and appeared to understand the conversation.  (Tr. at 36-38, 103).  Although the PO's were armed and the weapons were visible, no firearms were ever drawn during the conversation, and the PO's did not threaten Defendant, make him any promises or otherwise coerce him.  He never requested that the interview stop and did not ask for an attorney.  (Tr. at 35-38).

When AC Chapple returned and reported on the items found in the Infinity, Defendant was advised that the PO's were going to search his residence, and he was escorted to an unmarked official vehicle.[9]  (Tr. at 39-41, 103).  AC Chapple and PO Brown transported Defendant to the apartment complex.  During the drive, Defendant was not handcuffed, and no firearms were drawn.  He was only restrained by a seatbelt and was seated in the backseat of the vehicle.  (Tr. at 40-41, 103-04, 115).  Defendant was not free to elect not to accompany the officers.  (Tr. at 85, 116).  During the trip to the apartment complex, Defendant stated that he did not understand why they were going to the apartment.  The officers discussed Defendant's violations and questioned

---

[9]According to the officers, it was standard procedure for a parolee to accompany the officers when a decision to search had been made.  (Tr. at 46, 111).

11

him about which apartment was his residence. He continued to state that he lived in

apartment number 3050. (Tr. at 41-42, 104-05, 107, 116-17). When asked if he was

telling the truth, Defendant responded, yes. (Tr. at 108). AC Chapple stated that

Defendant did not appear to be under the influence during the drive and that the

officers did not make him any promises or threaten him. (Tr. at 104-05). While

traveling to the apartment complex, PO Brown decided to request an arrest warrant for

Defendant, and AC Chapple made the call asking for the warrant. (Tr. at 41, 83, 108,

117).

When they arrived at the apartment complex, entered the parking deck and

reached the third level, with access to apartment number 3050, Defendant advised PO

Brown, who was driving, to park on that level. (Tr. at 42). When she continued to

drive to the fourth level and park, Defendant was quiet. (Tr. at 42). PO Brown and

AC Chapple exited the vehicle, leaving Defendant with other PO's, and went to

apartment 4050. (Tr. at 42-43). After receiving no response when they knocked and

announced their presence, the officers used the key provided by Defendant's girlfriend

earlier to AC Chapple and entered the apartment. (Tr. at 43). Inside the master

bedroom, PO Brown recovered a silver handgun found in plain view on top of a parole

supervision form on the headboard. (Tr. at 43). In a brown paper bag in a drawer

attached to the bed, she found a gun pouch with a smaller caliber handgun.  (Tr. at 44).

And in another bedroom closet, she located a "large-like" press with a white powdery

residue, and on a shelf in the hallway, she found a piece of ammunition for an

automatic rifle or gun.  (Id.).

AC Chapple primarily searched the kitchen and found underneath the sink a

black duffle bag containing a plastic bag with a brown substance, a scale and a bottle

of a chemical.  (Tr. at 45, 105-06).  In a cabinet, he found some baking soda and a

mixer with a brown residue.  (Tr. at 106).  He also found a rifle scope and a lease and

power bill.  (Id.).  Because of these items, the Atlanta Police Department ("APD") was

contacted, and officers responded to the scene.  (Tr. at 45).  Also, another PO arrived

with the warrant for Defendant's arrest.  Defendant was escorted, handcuffed, into the

apartment.  (Tr. at 45, 87, 108, 115-16, 118).  He was turned over to APD's custody.

(Tr. at 45).

Investigator David Stribling, APD Narcotics Division, was one of the officers

who responded to the apartment.  After being at the apartment approximately thirty

minutes, he attempted to interview Defendant who was in the den area of the

apartment.  (Tr. at 125-27, 136).  He verbally advised Defendant, who was standing,

of his Miranda rights, stating:

13

> Okay, Mr. Brown, I am advising you of your rights.  You have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have the right to an attorney.  If you cannot afford an attorney, one will be provided for you free of charge and may be present anytime during questioning.  You can decide at any time not to answer any statements or any questions - - make any statements or answer any questions that I ask you.  Do you understand your rights?

(Tr. at 128, 137, 139).  Defendant responded, yes.  (Tr. at 128).  Investigator Stribling repeated, do you "understand you ain't got to say nothing to me?"  Defendant stated, "yeah."  And, do you understand that you can have an attorney and that if you "can't afford one," one will be provided?  Defendant responded, yeah.  (Tr. at 128-29).  The investigator then asked if Defendant had something that he wanted to tell the officer.  The conversation with Defendant, who did not say much but asked a lot of questions, was unproductive, and the investigator terminated the interview.  (Tr. at 129, 132).  Defendant did not invoke his rights or refuse to answer questions.  (Tr. at 130, 133).  Defendant was handcuffed and appeared calm with normal mental and physical capacities.  (Tr. at 130-31).  His speech was coherent.  He was not promised anything and was not threatened.  Although the investigator was armed, his weapon was not visible.  (Tr. at 131-32).  After terminating the interview, the investigator sat with Defendant approximately forty minutes waiting for agents with the Bureau of Alcohol, Tobacco and Firearms ("ATF") to arrive.  (Tr. at 135, 138).

14

When the ATF agents arrived, Task Force Officer ("TFO") Kenneth Fisher, who was an APD officer assigned to the Violent Crimes Task Force, interviewed Defendant. (Tr. at 140-41). After being at the apartment a short time, less than twenty minutes, TFO Fisher, accompanied by Officer Munson and Investigator Stribling, escorted Defendant to the master bedroom and removed the handcuffs. (Tr. at 143, 150). Defendant was allowed to use the restroom and was provided with a drink. (Tr. at 143). After identifying himself by showing his credentials and advising that he was conducting an investigation concerning firearms, the TFO advised Defendant of his <u>Miranda</u> rights using an ATF rights and waiver form. (Tr. at 142-43; Gov't Ex. 4). Defendant was advised:

> You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer before we ask you any questions and to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you if you wish before any questioning begins. If you decide to answer any questions now without a lawyer present, you have the right to stop answering at any time.

(Tr. at 144; Gov't Ex. 4). The TFO then read to Defendant the waiver:

> I have read this statement of my rights, and it has been read to me, and I understand these rights. At this time I'm willing to answer questions without a lawyer present. No promises or threats have been made to me, and no pressure or force of any kind has been used against me.

15

(Tr. at 145-45; Gov't Ex. 4).

TFO Fisher, after asking Defendant if he could read, write and understand English, then allowed Defendant to read the form to himself and asked Defendant to initial each line if he understood that line. Defendant did so. Defendant stated that he understood his rights and was willing to answer questions. He executed the form. (Tr. at 143-146, 149; Gov't Ex. 4). The TFO did not make Defendant any promises or threaten him. The officers and Defendant were seated. Defendant appeared concerned but fine. (Tr. at 146-47). Defendant did not appear under the influence; his speech was coherent; he appeared to understand the questions; and he did not refuse to answer questions or ask for a lawyer. (Tr. at 146-48). The officers' firearms were holstered and not visible. (Tr. at 147-48). Defendant asked what he could do to get out of trouble, and the TFO explained the proffer process indicating that Defendant needed to be assigned a lawyer to work with the United States Attorney's Office. (Tr. at 150-51). TFO Fisher decided when to terminate the interview. (Tr. at 148).

Additional facts will be set forth as necessary during discussion of Defendant's claims.

## II.   Discussion

### a.   Search of Apartment

16

In his post-hearing brief in support of the motion to suppress, Defendant only challenges the warrantless search of the apartment located at 390 17th Street, Apartment 4050, in Atlanta, contending that the parole officers were required to have a reasonable suspicion to support the search and that the facts did not establish a reasonable suspicion.  [Doc. 58 at 7-10].  Although Defendant recognizes the Supreme Court decision in <u>Samson</u>, he does not address the Court's determination, as will be discussed *infra*, that suspicionless searches of parolee's and their property is authorized under the circumstances set forth in this case.  [<u>Id.</u>].  Defendant also does not challenge the pat down search of his person at the parole office or the warrantless search of the Infinity SUV while it was located at the parole office.  [<u>Id.</u>].  As noted, the Government opposes the motion to suppress contending that no reasonable suspicion was required in this case for the search of the apartment, that even if reasonable suspicion was required the facts establish a basis for the search, and that in any event Defendant waived his right to challenge the search.  [Doc. 61].

In <u>Samson</u>, the Supreme Court first affirmed that when resolving challenges under the Fourth Amendment, courts "'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment."  547 U.S. at 848, 126 S. Ct. at 2197 (citation omitted).  The Court then

discussed the holding in United States v. Knights, 534 U.S. 112, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001), in which the Court upheld the warrantless search of a probationer's apartment based on a reasonable suspicion of criminal activity and on a condition of supervision providing for a warrantless search. Samson, 547 U.S. at 848, 126 S. Ct. at 2197. The Court noted that, balancing the significantly diminished expectation of privacy held by the probationer against the legitimate governmental interests served by probation searches, "we held that '[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.'" Id. at 849-50, 126 S. Ct. at 2198 (quoting Knights, 534 U.S. at 121, 122 S. Ct. at 592). However, the Court noted that under the circumstances of that case, "we did not reach the question whether the search would have been reasonable under the Fourth Amendment had it been solely predicated upon the condition of probation." Id. at 850, 126 S. Ct. at 2198 (citation omitted). That question was resolved, in the context of a parolee search, by the Court in Samson. Id.

First, the Court noted that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to

18

imprisonment." Id.  Second, "as [the Court] found 'salient' in Knights with respect to the probation search condition, the parole condition under California law-requiring inmates who opt for parole to submit to suspicionless searches by a parole officer or other peace officer 'at any time,' . . . was 'clearly expressed' to [the defendant]." Id. at 852, 126 S. Ct. at 2199 (citations omitted).  Accordingly, the Court stated: "Examining the totality of the circumstances pertaining to [the defendant's] status as a parolee, 'an established variation on imprisonment,' . . . including the plain terms of the parole search condition, we conclude that [the defendant] did not have an expectation of privacy that society would recognize as legitimate." Id. (citations omitted).

Compared to a parolee's lack of a reasonable expectation of privacy under these conditions, the Court stated:

> The State's interests, by contrast, are substantial.  This Court has repeatedly acknowledged that a State has an "'overwhelming interest'" in supervising parolees because "parolees . . . are more likely to commit future criminal offenses." . . .  Similarly, this Court has repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment.

19

547 U.S. at 853, 126 S. Ct. at 2200 (citations omitted).   The court found that "California's ability to conduct suspicionless searches of parolees serves its interest in reducing recidivism, in a manner that aids, rather than hinders, the reintegration of parolees into productive society." Id. at 854, 126 S. Ct. at 2200.  For the reasons cited, the Supreme Court "conclude[d] that the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." Id. at 857, 126 S. Ct. at 2202.

Likewise, in the instant case, based on the totality of the circumstances, this court finds that Defendant Brown "did not have an expectation of privacy [in his apartment - or in his person or the Infinity] that society would recognize as legitimate." Id. at 852, 126 S. Ct. at 2199.   And, the State of Georgia has a substantial counterbalancing interest in taking the necessary measures, including conducting suspicionless searches of parolees, to reduce recidivism and assist in reintegration of parolees into society. Id. at 853-54, 126 S. Ct. at 2200.  Defendant's rights under the Fourth Amendment were not violated by the searches of his person, the Infinity or the apartment.

Defendant is a parolee.  After being released on January 7, 2009, as required, he met with PO Boatwright on January 8, 2009, to review, acknowledge, and execute the

20

standard conditions and special instructions governing his parole.  (Tr. at 5-8; Gov't Exs. 1 & 2).  The standard conditions of his parole, which Defendant was required to acknowledge and to agree to remain on parole, included: "[m]y Parole Officer or any Parole Officer may, at any time, conduct a warrantless search of my person, papers, and place of residence, automobile, or any other property under my control."[10]  (Tr. at 8-13; Gov't Ex. 2).  As witnessed by PO Boatwright, Defendant signed the page on which this provision is set forth below the statement, "I have read or have had read to me the above standard Parole Conditions[.]"  (Gov't Ex. 2).  Accordingly, Defendant was aware of and accepted this search provision as a condition of his release on parole.

On September 9, 2009, subject to the search provision, and after PO Brown determined that Defendant was in violation of his parole, Defendant's supervising PO Brown, Chief Morrow, and AC Chapple participated in searches of Defendant's person, the Infinity SUV in which he arrived at the parole office, and apartment 4050, 390 17th Street - which had been determined to be Defendant's residence.  (Tr. at 17-19, 23, 26, 29, 32-33, 42-45, 77-81, 97-100, 105-06).  Defendant simply lacks a

---

[10]This is the same condition that the Eleventh Circuit Court of Appeals in United States v. Stewart, 213 Fed. Appx. 898 (11th Cir. 2007), and the District Court in the Middle District of Alabama in United States v. Brown, 2009 WL 112574 (M.D. Ala. January 15, 2009), applied to uphold a warrantless search of a Georgia parolee's residence pursuant to Samson.

21

reasonable expectation of privacy to challenge under the Fourth Amendment any of the searches.[11]  See Samson, 547 U.S. at 852, 126 S. Ct. at 2199.  And, in light of the State's substantial interest in supervising parolees, under the totality of the circumstances, the searches were reasonable under the Fourth Amendment.[12]  Id. at 857, 126 S. Ct. at 2202.

Therefore, all of the items taken off Defendant's person, including the cellular telephone and U.S. Currency, the items seized from the Infinity, including U.S. Currency, receipts, and identification, and the items seized from the apartment,

---

[11]For this reason, as did the Supreme Court in Samson, this court declines to reach the issue of whether Defendant's execution of the standard conditions of parole constituted a waiver of - or a consent to waive - his Fourth Amendment rights.  547 U.S. at 852 n.3, 126 S. Ct. at 2199 n.3.

[12]This court also does not find any reason to distinguish the decision in Samson based on the fact that the parolee therein was subject to a search of his person as compared to the searches in this case not only of Defendant's person but the vehicle and his residence.  See United States v. Lopez, 474 F.3d 1208, 1212-14 (9th Cir. 2007) (concluding that the fact Samson involved a search of the parolee's person as compared to the case before the court involving a search of the parolee's residence did not impact the applicability of the decision to the facts of the case and finding that suspicionless search of parolee's residence under condition of parole did not violate the Fourth Amendment); and see Stewart, 213 Fed. Appx. at 899 (although distinction was not discussed, Samson applied to uphold warrantless search of parolee's bedroom); United States v. Massey, 461 F.3d 177, 178-79 (2nd Cir. 2006) (same); Brown, 2009 WL 112574, at **2-3 (same).

22

including the firearms, ammunition, rifle scope and controlled substances and drug paraphernalia, are admissible in evidence.

Given the court's finding that resolution of the motion to suppress is controlled by Samson, the court will not address in great detail the Government's alternative grounds for upholding the search, that is, that the PO's had the necessary reasonable suspicion to conduct the searches of Defendant, the vehicle and the apartment.  The court finds that the PO's did have "'a sufficiently high probability that criminal conduct [was] occurring to make the intrusion on [Defendant's] privacy interest reasonable.'"  United States v. Walley, 271 Fed. Appx. 966, 968 (11th Cir. 2008) (citation omitted); see also United States v. Yuknavich, 419 F.3d 1302, 1311 (11th Cir. 2005) (examining application of the Fourth Amendment to the search of a probationer's computer, when there is no search provision in terms of release, and finding that a reasonable suspicion, that is, "look[ing] at the totality of the circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing[,]" satisfies the balancing test).  By the time of the searches in this case, the PO's knew that Defendant had received several verbal reprimands, including failure to report as required and two positive drug tests; that there were issues with the validity of Defendant's employment, especially when

23

considering the difficulty that PO Brown had in finding and meeting with Defendant on August 27; that Defendant had changed his residence without permission; and most importantly, that Defendant repeatedly lied to the POs about his change of address and about the address to which he had relocated, indicating that he was attempting to hide the location of that residence from the POs. (Tr. at 17-20, 22-31, 34-35, 42-43, 55-56, 59-61, 66-68, 70-74, 77-81). The POs reasonably concluded that Defendant's repeated efforts, including up to the time he arrived with the POs on the parking deck of the apartment complex, to mislead them as to the location of his residence indicated that he had items therein which should not have been in his possession. The totality of this information established a reasonable suspicion of wrongdoing.

For these reasons, the court **RECOMMENDS** that Defendant's motion to suppress evidence be **DENIED**.

### b.   Statements

As noted, besides contending that his statements, which were not specified, constitute fruits of the illegal search of his apartment, Defendant does not otherwise offer any argument in support of suppressing those statements, either before or after his formal arrest. [Doc. 58]. Having found that the search of the apartment was

24

lawfully conducted pursuant to Samson, the court **RECOMMENDS** that Defendant's motion to suppress statements be **DENIED**.

## III.   Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 28] to suppress evidence and statements be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO RECOMMENDED AND ORDERED** this 3rd day of January, 2011.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

25